## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID BROWN,

       *Plaintiff,*

*v.*

DR. DONALD HAIDERER,

       *Defendant.[1]*

_____/

CASE NO. 4:21-cv-11565

DISTRICT JUDGE MATTHEW F. LEITMAN
MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON RENEWED MOTION FOR SUMMARY JUDGMENT (ECF No. 89)

### I.  RECOMMENDATION

For the following reasons, **I RECOMMEND** that Defendant Dr. Haiderer's renewed motion for summary judgment (ECF No. 89) be **GRANTED** and Defendant Dr. Haiderer be dismissed from this lawsuit. If this recommendation is adopted, there would be no surviving claims and the case would be dismissed in its entirety.

---

[1] Other Defendants were dismissed from this case on September 1, 2022.

## II.  <u>REPORT</u>

### A.  Background

On June 21, 2021, Plaintiff David Brown, a Michigan Department of Corrections ("MDOC") prisoner housed at the G. Robert Cotton Facility ("JCF") in Jackson, Michigan, filed suit in this Court. After an initial round of dispositive motions, the remaining claims are for violations of his First and Eighth Amendment rights under 42 U.S.C. § 1983. Generally, Plaintiff alleges that Defendant Haiderer was deliberately indifferent to his serious medical needs, i.e., contact lenses, in violation of the Eighth Amendment, and that Defendant Haiderer's failure to provide the contact lenses was motivated by Plaintiff filing a grievance against Defendant in violation of the First Amendment.

The background facts and summary of averments stated in the complaint are delineated in the former Report and Recommendation (R&R) filed on March 15, 2023 (ECF No. 66) and need not be repeated here.

### B.  Summary Judgment Standard

A court will grant a party's motion for summary judgment when the movant shows that "no genuine dispute as to any material fact" exists. Fed. R. Civ. P. 56(a). In reviewing the motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of

showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot merely rest on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a pro se party's

3

arguments are entitled to liberal construction, "this liberal standard does not ... '[relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D.N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D. N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

After examining the evidence designated by the parties, the court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## C. Analysis

### 1. The Eighth Amendment Claim

#### a. Legal Principles

Under the Eighth Amendment, prisoners have a constitutional right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Prison officials may not act

4

with deliberate indifference to the medical needs of their prisoners. *Id.* at 104. An Eighth Amendment claim has two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002). Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id*. A plaintiff can "establish the objective component by showing that the prison ... provided treatment 'so cursory as to amount to no treatment at all.'" *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009)).

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834. Deliberate indifference "entails something more than mere negligence," *id.* at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* To establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Id.* at 837. Deliberate indifference may be established by showing an interruption of a prescribed plan of treatment, or a delay in medical treatment. *Id.*; *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992). However,

disagreement about the course of treatment does not present a constitutionally cognizable claim under § 1983. *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). The Eighth Amendment does not require that every request for medical care by an inmate or specific type of care be honored. *Fitzke v. Shappell,* 468 F.2d 1072, 1076 (6th Cir. 1972).

### b. Analysis

### i. History of treatment and kites

Plaintiff has a long history of receiving medical attention with respect to his ongoing issues with contact lenses that is more thoroughly fleshed out in the instant renewed motion for summary judgment. On September 2, 2009, Plaintiff was scheduled for an eye examination two days later because he complained that his "new contact don't fit, vision blurry and eyes hurt." (ECF No. 89, PageID.700.)

On October 8, 2009, Plaintiff was scheduled for an appointment with the DWH eye clinic for new contact lenses because his prescription had changed. (ECF No. 89, PageID.702.)

On October 16, 2009, Plaintiff sent a kite complaining that his "contact lenses are too tight." (ECF No. 89, PageID.704.)

On March 16, 2010, it was noted that Plaintiff "refused to go to ophthalmology appointment at DWH on 3/15/10 – prisoner refused to put black box on. Appointment rescheduled for 4/15/10 @ 0900." (ECF No. 89,

PageID.706.) On April 15, 2010, it was noted that Plaintiff "again refused to go to his DWH Ophthalmology (contact pick-up) appointment on 4/15/10 because he did not want to put a black box on." (ECF No. 89, PageID.708.)

On April 29, 2010, Plaintiff sent a kite complaining that "[m]contact lenses aren't fitting" (ECF No. 89, PageID.710.)

On June 6, 2011, it was noted that "following offsite return [from] DWH Optometry Clinic" that Plaintiff "[r]efused to try on lens[.]" (ECF No. 89, PageID.712.)

On July 13, 2011, it was noted that Plaintiff "initially refused [contact lens] 6-6-2011 due to 'discomfort' after 12 seconds of wear, according to [Plaintiff]" and that he "now wants soft lens and hard lens combined." (ECF No. 89, PageID.714.) On that same date, Plaintiff filed a kite complaining that his new contact lens was "causing extreme discomfort and the vision while wearing it is not clear…he wore the lens from 0900 to 1900 with no improvement in comfort or vision." (ECF No. 89, PageID.716.) The response requested that Plaintiff adjust to it, as he had been previously told, "by wearing it only 1-2 hours at a time with several hours between wearings and gradually increasing wear time throughout the month." (*Id*.)

On August 8, 2011, a different doctor, Dr. Berhane, noted that Plaintiff is a "41 year old pt with visual problems since 2004, not compliant with fitting of contact lens provided to him…Pt states he did decline the contact lenses after

7

trying them on for 8 days, because they were not helping. Pt wants to know if corneal transplant is good for him. He is currently being assisted for all his needs." (ECF No. 89, PageID.720.)

On December 17, 2011, Defendant noted that his office was "waiting for 'pending' offsite for DWH optometry for contact lens evaluation for soft perm contact lens" and that Plaintiff "wears solar shields and has vision assistance for mobility. However, he appears to have good eye contact and is visually aware." (ECF No. 89, PageID.718.)

On February 6, 2014, it was noted that Plaintiff underwent a consultation with Kellogg Eye Center on December 24, 2014. Dr. Gerlach also noted that "[t]hey [Kellogg Eye Center] again suggested trying PROSE device[2] before surgery." (ECF No. 89, PageID.724.) Dr. Gerlach concluded that "[a]t this time we do not plan to get him this device or contacts again d/t past abuse of them…If pt would like to have glasses ordered for him, he can kite for an appointment to have an exam." (*Id*.)

---

[2] Prosthetic Replacement of the Ocular Surface Ecosystem. "PROSE devices are transparent domes about the size of a nickel that are worn in the eyes daily and removed at night. They rest on the sclera (the white part of your eye) and over-not on-the cornea. This creates a smooth surface over the distorted, damaged, or diseased cornea. PROSE devices are made of gas-permeable material and must be filled with preservative-free saline solution each day before they are applied." DukeHealth, PROSE (Prosthetic Replacement of the Ocular Surface Ecosystem) Treatment www.dukehealth.org>prose (last visited 3/15/23, 7:43 p.m.).

On April 9, 2014, although Plaintiff had sent a kite for an appointment regarding dry eyes and migraines, when he arrived, he asked why he was there. (ECF No. 89, PageID.726.) After Nurse Oaks explained why, Plaintiff asked about a PROSE device. Nurse Oaks told him the PROSE device was "not an option" (referring to "4/3/14 entry RE PROSE device"), and Plaintiff responded with "'Fuck this, I'm out.'" (ECF No. 89, PageID.726.)  Nurse oaks also noted that Plaintiff "has a current pending eye contact order, we are waiting for them to arrive & he will be issued them." (*Id*.)

On June 25, 2015, the Medical Secretary for ICF, Jack Lewis, wrote a memorandum to Carson City Correctional  (DRF) Heath Care in anticipation of Plaintiff being transferred there.  Mr. Lewis wrote, in pertinent part:

> He [Plaintiff] claims he is blind but we have seen him reading and watching TV so we know that is not completely true. He does, however, have issues. He has keratoconus for which he has been treated with about every type of contact lenses but they never 'fit right, don't help his vision, get lost, break, etc.' Since he has abused so many lenses, there is a durable medical equipment contract in front of his chart that DWH will have him sign (I doubt that he will sign it) stating he understands he will be responsible for replacement contacts if/when the new ones are damaged/lost….Currently, we have an order placed for a new left CL. The new right CL is in his chart in the case….He tries to get all kinds of accommodations for his blindness, however, he ahs functioned here just fine without them. He does have an assistant for reading/writing and walking to/from health care, the library, etc. The biggest thing he tried to get is the PROSE device suggested by Kellogg Eye Center. This is not NOT a CL but he swears it is and would help him immensely. There are several pages of info under the consultation section explaining what it is as well as the cost and difficulty of use if you are interested. Another issue for him is that

he wants personal sunglasses which he is not allowed as a Level
V…He has been provided solar shields in the past and regularly
breaks them and states they don't help as much as regular sunglasses
would…There are also a couple broken/torn lenses in the chart. Not
sure if you want to continue keeping them, but we kept them for proof
of his past behaviors.

(ECF No. 89, PageID.728.)

On September 1, 2015, Dr. Gerald Kolk, saw Plaintiff and summarized:

I told him I would refer him back to have the contacts/fit evaluated if
he says he can't use them…and he doesn't like that idea…and brings
up the PROSE issue of the past, his lack of care…etc. I finally had to
tell him we're done here and the Officer was brought back in to usher
him out of the room – When I see 20/20 and 20/25+ VA on his chart of
8/13/15 and when he saw Dr. Linsley at DWH that is proof to me he
can see very well when he uses the proper Rx, namely the contacts
and the glasses over that. I tried to explain that to him and he wouldn't
hear of it…he even said he got that Rx from his people and he can't
see…I saw that it was only written 8/13/15 so that was
impossible…and he says 'you wanna bet?'…and that's when I said we
were done here today…I can't help someone who argues and even
swears at me…what kind of office visit is that?

(ECF No. 89, PageID.730-31.)(ellipses in original).

On February 12, 2016, Dr. Thomas Doyle consulted with Dr. Lavery from

the University of Michigan, "who saw inmate recently[.]" (ECF No. 89,

PageID.733.) Dr. Lavery "recommends a procedure DALP available at UM

Ophthalmology to treat his corneal condition. Contacts are not appropriate as

inmate is non-compliant and this could be a solution to his vision loss." (ECF No.

89, PageID.733.)

10

On March 23, 2017, Dr. Kolk saw Plaintiff and noted that Plaintiff "finally agreed to try the lenses on, which he did, and put the glasses on over the contacts. He painstakingly finally read the 20/200 S and L on the chart but couldn't/wouldn't go further. He had read 10/10 OD and 20/25 OS with that combination at the 8/13/15 eye exam at DWH. The chart also supports the fact that he has had a long Hx of damaging CLs and Solar Shields." (ECF No. 89, PageID.745.) Plaintiff "agreed to take the lenses and try them around his cell in combination with the glasses on [] it's been a long time since he has had any on. He kept refusing to wear them along with the glasses because the glasses are not tinted. He blames me for that…I didn't prescribe them though." (ECF No. 89, PageID.745.)(ellipses in original).

On January 22, 2018, in consultation with Dr. Keith Papendick, it was noted that Plaintiff was "last seen at Univ of MI Kellogg Eye Center (Cornea Clinic) w/ Dr. Hood on 3/22/16….Unable to tolerate contact lenses despite ongoing efforts for comfortable fit. Pt is poor contact lens candidate overall. Please consider cornea transplant. CL options have been exhausted." (ECF No. 89, PageID.736.)

On February 13, 2018, Dr. Christopher Hood saw Plaintiff and summarized that Plaintiff's "[l]evel of vision [was] not consistent with corneal shape, likely effort related to some degree" and that the "examination does not explain visual acuity." (ECF No. 89, PageID.739.) Dr. Hood noted that DALK was an option "but

he is a prisoner and I worry about trauma to the eye after surgery as well as the ability to continue to use drops and follow up appropriately." (ECF No. 89, PageID.739.)  Dr. Hood "recommend[ed] trial of PROSE lens OU if patient wants[.]" (ECF No. 89, PageID.739.)

On August 7, 2018, Dr. Hood recommended a "trial of PROSE lens OU if patient wants[.]" (ECF No. 89, PageID.750.) Although Dr. Hood continued to note that Plaintiff's "level of vision [is] not consistent with corneal shape" and that his "[e]xamination does not explain visual acuity[,]" Dr. Hood concluded that patient is unable to tolerate 'regular' or 'standard' contact lenses given his keratoconus. It is not because of non-compliance but because of his advanced keratoconus." (ECF No. 89, PageID.750.)

On September 28, 2018, Dr. Karen Deloss, with the University of Michigan, saw Plaintiff "for a PROSE evaluation for keratoconus + blurred, gray vision, +severe photophobia + eye pain + headaches." (ECF No. 89, PageID.753.)  Dr. Deloss questioned Plaintiff's tolerance, noted that he "did fair with PROSE today, moderate tolerance[,]" and indicated that "photophobia may or may not be mitigated with PROSE." (ECF No. 89, PageID.753.)

On October 10, 2018, Dr. DeLoss noted that Plaintiff's visual acuity was "20/40 however pt did not note significant improvement in vision and [had] not

great tolerance of lenses" so she "recommend[ed] pt see Dr. Hood for further eval."
(ECF No. 89, PageID.756.)

On November 16, 2018, Dr. Hood examined Plaintiff and noted that "per Dr.
DeLoss, pt did not tolerate PROSE lenses well and did not have significant
improvement in vision" but also noted that "pt still interested in repeat trial if
possible[.]" (ECF No. 89, PageID.759.) Dr. Hood noted that Plaintiff's "level of
vision previously not consistent with corneal shape- likely effort-related, as with
repeat testing today was able to see 20/30sc OD, and 20/125 sc OD." (ECF No. 89,
PageID.758.) Dr. Hood also noted that with Plaintiff's current vision, "OS, SCL vs
PROSE vs monitoring vs transplant are his options. Pt not interested in transplant
currently." (ECF No. 89, PageID.759.)

On January 17, 2019, "Jackie from Ionia Correctional Facility called on
behalf of the facility doctor. They would like to know if the patient could be
scheduled for another trial for PROSE lens. They understand the patient can be
non-compliant. The patient has stated he would like to try PROSE lens again."
(ECF No. 89, PageID.763.) Dr. Deloss responded, "I will no longer see this patient.
Thanks." (ECF No. 89, PageID.763.) The next step was for a "follow up with Dr.
Hood to discuss further for PKP/DALK to OS." (ECF No. 89, PageID.763.)

On February 4, 2019, a review of Plaintiff's file revealed that "PROSE
LENS is no longer an option" and that "Dr. Hood (Cornea Clinic) recommended

f/u within the month for a surgical consult OS w/PKP/DALK. Patient has exhausted all options at this point for contact lends fitting attempts (DWH Optometry and U of M) as well as PROSE Lens fitting (U of M). Only option left is surgery for the left eye as recommended by Dr. Hood." (ECF No. 89, PageID.766.)

On February 19, 2019, Dr. Hood noted that Plaintiff's "[l]evel of vision previously not consistent with corneal shape – likely effort-related" and that "[v]ision OD down today (though went from CF at 6 feet to 20-250 sc with MD recheck)." (ECF No. 89, at PageID.768.) Dr. Hood further noted that they had "[p]ursued PROSE fitting with Dr. DeLoss. Per encounter, no significant improvement in vision and patient did not tolerate lenses" and that "[p]atient would like to have a retrial of PROSE lenses as he felt vision improved – schedule with Dr. Leung for refit of CL, if no improvement, can consider PKP/DALK OS." (ECF No. 89, PageID.768.)

On April 17, 2019, Dr. Leung noted that Plaintiff had "worn Europa and SynergEyes CLs in the past but they were not comfortable" and that he "is also very light sensitive." (ECF No. 89, PageID.771.) Dr. Leung also found a "[g]ood fit with Zenlens.[3]

---

[3] ZenLenses are scleral lenses, which rest on the whites of the eyes (the sclera) rather than on the cornea. "Scleral contact lenses are made of gas-permeable material. They allow oxygen to pass through to your cornea. Scleral lenses are valuable if your corneas are

OU. VA is greatly improved to 20/30 OU but pt complains that he sees 'shadows' around letter. He is still light sensitive. I explained that it is the best CLs can offer and it will not solve the light sensitivity symptoms. Pt states that he is willing to proceed with CLs." (ECF No. 89, PageID.771.)

On June 5, 2019, Dr. Leung noted that Plaintiff received some training on insertion and removal of the contact lenses and that he was able to successfully insert and remove his lenses. (ECF No. 89, PageID.773.) Plaintiff was also instructed and indicated that he understood how to properly clean his lenses. (ECF No. 89, PageID.774.) Dr. Leung noted that Plaintiff "had good vision at Zenlens OU but that light sensitivity was not improved" and that after having been "evaluated for PROSE by Dr. DeLoss on 10/9/2018" it "was documented that PROSE did not significantly improve vision and pt was not able to tolerate the CLs." (ECF No. 89, PageID.776.) Although Plaintiff "kept trying to be re-evaluated for PROSE because he thought 'PROSE is the most sophisticated CL'[,]

---

abnormally shaped, as in astigmatism and keratoconus." https://www.webmd.com/eye-health/what-to-know-about-scleral-contact-lenses (last visited March 13, 2023). Moreover, "scleral lenses can morph an irregular cornea into a smooth optical surface to correct vision problems caused by keratoconus and other forms of corneal ectasia. Furthermore, the space between the cornea and the back of the scleral lens acts as a fluid reservoir, continuously bathing the cornea. This can provide relief for people with severe ocular surface disease and may help the ocular surface to heal." American Academy of Ophthalmology, Update on Scleral Lenses, Gabrielle Weiner. https://www.aao.org/eyenet/article/update-on-scleral-lenses (last visited March 13, 2023).

[a]fter much discussion, pt agreed to go ahead with Zenlens" and "was told to wear sunglasses over the Zenlens." (ECF No. 89, PageID.776.)

Plaintiff sent a kite on June 18, 2019, complaining that his contact lenses "are causing him pain and excessive tearing after 30 min of wearing" and that he "can't read letters or numbers up close or at a distance when wearing them." (ECF No. 89, PageID.779.) The June 21 response indicated that Plaintiff was scheduled to see the eye doctor and instructed him that if he needed to be seen sooner, he should "kite medical to be assessed by nursing." (ECF No. 89, PageID.779.) Plaintiff also sent a similar kite on June 28, 2019, and July 16 and July 29, 2019 adding that the "PROSE device is much more comfortable when wearing than the current CL" and that he is "seeing double vision and light is causing him headaches." (ECF No. 89, PageID.781, 783, 784.) Plaintiff was told he could "address all your issues when you are seen at your follow-up appointment at Kellogg Eye Center." (ECF No. 89, PageID.781, accord, 783, 784.)

Plaintiff was seen at the Kellogg Eye Center on August 7, 2019 for his follow-up visit. Dr. Leung noted that Plaintiff "insists that PROSE will provide better vision and comfort" but that Plaintiff "indeed had a PROSE evaluation in 10/2018" and that although "BCVA was 20/40" Plaintiff "did not notice a subjective visual improvement and CL tolerance was not good" so "[i]t was decided that Pt should not pursue PROSE at that time." (ECF No. 89, PageID.786.)

Dr. Leung stated that he would "talk to the prison health clinic about a repeat PROSE evaluation. But given the similar BCVA in Zenlens and PROSE, and poor tolerance of both CLs in the past, I don't believe PROSE will provide a satisfactory solution to pt's visual problems." (ECF No. 89, PageID.786.)  On that same day, August 7, 2019, when Plaintiff returned to prison, he "refuse[d] new contacts, state[d] he wants a new exam, state[d] his vision is not acceptable." (ECF No. 89, PageID.788.) The next day, August 8, 2019, Plaintiff sent a kite with similar complaints and the response indicated the prison would "chart review the eye doctor to determine the next step with the lenses." (ECF No. 89, PageID.790.)

On September 12, 2019, although Plaintiff had "told the offsite MP that the contacts were uncomfo0rtable and he refused them[,]" he "told them he had a contact container in the van." (ECF No. 89, PageID.792.)  Although he was "instructed to leave the contacts at the offsite clinic front desk before leaving[,]" "[h]e did not return so upon return to DRF custody shook him down and found the contacts on him." (ECF No. 89, PageID.792.) Plaintiff asked for them so the "nurse handed him the contact container in the waiting room and a couple minutes later he returned them saying one was missing…there was only one contact and neither holder area had any contact solution in them."(ECF No. 89, PageID.792.)

17

On September 24, 2019, Plaintiff again sent a kite requesting PROSE lens and the response stated he would be scheduled to see the eye doctor. (ECF No. *9, PageID.794.)

On November 6, 2019, Plaintiff again sent a kite 'regarding the same issue…needs new PROSE contacts lenses" and adding that "solar shields should not be worn indoors[.]" (ECF No. 89, PageID.796.) The response reminded Plaintiff to "please wear the Solar shields for photophobia as instructed by the eye doctor, they can be worn indoors, many people do wear them like that. You will be scheduled to see the OD soon, she can discuss your contact issue with you again." (ECF No. 89, PageID.796.)

On November 14, 2019, Plaintiff was transferred to Saginaw Correctional Facility (SRF). (ECF No. 58, PageID.323.)

Plaintiff again sent a kite on November 17, 2019 and the response indicated that he had "a scheduled appointment with the optometrist this week." (ECF No. 89, PageID.798.)

On November 18, 2019, Plaintiff was examined by Defendant Dr. Haiderer, who continued Plaintiff's current prescriptions and also added Ibuprofen to Plaintiff's regimen. (ECF No. 89, PageID.800.)

Plaintiff sent a kite on December 5, 2019, complaining that he should have been given a referral to U of M, and the response noted that Plaintiff had "an upcoming appointment with optometry." (ECF No. 89, PageID.803.)

On December 9, 2019, Plaintiff sent another kite adding that he was experiencing "black outs from lack of sight daily headaches [and that h]is balance is off" and "shooting pain from his eyes into his temple." (ECF No. 89, PageID.805.) The response indicated that although a registered nurse "spoke with actual inmate" that he "declined to be seen by nursing." (ECF No. 89, PageID.805.)

On December 16, 2019, Plaintiff was examined by Dr. Haiderer who discussed Plaintiff's diagnoses with him and noted that Plaintiff has "multiple unsuccessful attempts" with offered treatments, was "[g]enerally unco[o]perative", "malingering," "refuses glasses, corneal transplant" and that his "symptoms do not match and unable to determine objective findings." (ECF No. 89, PageID.809.)

On March 15, 2020, Plaintiff again filed a kite complaining about "pain, bulging, vision getting worse, solar shields, light sensitivity, triple vision, dizziness, wanting contact lens" and the response noted that "[t]he issues you described above have been addressed previously by the Optometrist." (ECF No. 89, PageID.812.) The response also indicated that "[d]ue to the State of Emergency in Michigan [due to Covid 19], health care is only seeing urgent and emergent

appointments…You are already on the list to be seen by the optometrist next time he is here." (ECF No. 89, PageID.812.)

On July 21, 2020, Plaintiff was seen by Curtina Jones, RN, who provided Plaintiff with Motrin and "encouraged [him] to stay safe as much as possible and use [the] assistant [he had previously been given]." (ECF No. 89, PageID.815.)

On February 10, 2021, Plaintiff was seen by Dr. Leung, OD, who found that Plaintiff's Zenlens contacts were a "good fit" and provided "reasonable comfort." (ECF No. 89, PageID.817.) Dr. Leung explained and Plaintiff "understands that the CLs will not [provide] relief [for] the photophobia" so that Plaintiff would "wear[] sunglasses over the CLs." (ECF No. 89, PageID.817.) Plaintiff "claims that he lost hi CLs and has not worm the CLs for months. He reports that he was getting used to the CLs when he lost them" so Dr. Leung planned to "check with insurance before ordering CLs." (ECF No. 89, PageID.817.)

The next day, on February 11, 2021, Plaintiff was seen by Laura Brown, NP, who noted Plaintiff's past history of "failed or noncompliant" treatment, that he had been seen at the Kellogg Eye Center "yesterday" when Dr. Leung requested that Plaintiff "wear sunglasses and reading glasses over the contact lens when applicable." (ECF No. 89, PageID.823.) NP Brown noted that Plaintiff was "agreeable to plan of care." (ECF No. 89, PageID.823.)

On February 16, 2021, NP Brown discussed Plaintiff's case with MDOC Optometrist, Dr. Haiderer, who "is recommending bifocal glasses as an alternative to the Zenlens contacts." (ECF No. 89, PageID.825.) It was noted that "[i]nmate [was] to be apprised once COVID protocol allows nonurgent/emergent visits." (ECF No. 89, PageID.825.)  It was further noted in an email from Dr. Haiderer on February 16, 2021, that Kellogg Eye had "'advised Rigi Gas Permeable contacts instead of glasses Rx. He obviously has a poor history of compliance so success is questionable. Contacts are meant to last for years with replacement MDOC's responsibility, although they are expensive. Also, he would require reading glasses over contacts to read. An ACMO was recently denied for contacts. Also they are not a medical necessity. One option is to provide [Plaintiff] with bifocal glasses.'" (ECF No. 89, PageID.825.)

On February 18, 2021, NP Brown informed Plaintiff of the decision to order bifocals and although Plaintiff "states disappointment with this decision as he has tried bifocals in the past" he stated he was "agreeable to try them again." (ECF No. 89, PageID.827.)

On March 9, 2021, Plaintiff was seen by Dr. Haiderer who cited to his "long term history of documented contact lens issues and non successful contact fittings" as well as his "obvious malingering related to vision deficit and sensitivity to light." (ECF No. 89, PageID.829.) Dr. Haiderer noted that although Kellogg Eye

21

"requested refit with Zenlens…inmate has documented numerous multiple failures with contact lens wear X 10 years. Multiple contacts tried and failures due to comfort, non compliance, lost, abuse and general discomfort. He is malingering his vision deficit. H/C and custody have observed good mobility in his environment with no correction. He refused bifocal glasses and corneal surgery is not recommended. In general he has a poor potential for successful contact lens wear in corrections." (ECF No. 89, PageID.830.)

On June 14, 2021, Dr. Haiderer treated Plaintiff and noted he "[a]damantly refuses glasses (only over contacts)" and that he had "sight assistance in H/C and Housing Unit" that was "OK." (ECF No. 89, PageID.832.) Dr. Haiderer also noted that Plaintiff "admits he is not blind, although he acts as 'blind.' Full hooded face covers with eyes not visible and would not remove hood. Obvious malingerer due to multiple H/C/ and Staff accounts. Inmate dropped a sheet of paper, promptly reached out and easily pick[ed] it up." (ECF No. 89, PageID.832.)

### ii. Eighth Amendment claim

As noted in the previous R&R, as to the objective component of the Eighth Amendment claim, it is not in dispute that Plaintiff suffers from keratoconus, which Dr. Leung described as "a progressive degenerative condition characterized by thinning and irregularity of the central cornea, causing blurred and distorted

vision as well as light sensitivity." (ECF No. 62, PageID.456). Plaintiff has shown a sufficiently serious condition to satisfy the objective prong.

As also noted in the previous R&R, as to the subjective component, it is not disputed that Dr. Haiderer perceived and recognized that Plaintiff suffered from keratoconus, and drew the inference that Plaintiff required treatment for that condition. The question is whether there is sufficient evidence in the record from which a trier of fact could find that Dr. Haiderer was deliberately indifferent to the risk posed by Plaintiff's condition. In other words, did Dr. Haiderer's treatment protocol rise above a level of mere negligence to an Eight Amendment violation?

Dr. Haiderer argues that Plaintiff's complaint amounts to no more than Plaintiff's own disagreement with his medical judgment and that federal courts generally will not second guess medical judgments nor will the courts find deliberate indifference where the inmate disagrees with medical diagnoses or selected treatment, even where suffering results. (ECF No. 89, PageID.682), citing *Jarrett v. Pramstaller*, 2010 U.S. Dist. LEXIS 13169, *15 (W.D. Mich. Feb. 16, 2010), citing *Westlake*, supra..

At the time the previous R&R was written, the exhibits presented focused primarily on Defendant Haiderer's annoyance with Plaintiff without sufficient medical evidence to support his decision making. I suggest that Defendant Haiderer has supported this motion with sufficient evidence to show there is no genuine issue

of material fact regarding the subjective prong of the Eighth Amendment claim; thereby entitling him to summary judgment.

When Plaintiff transferred to SRF and was first examined by Defendant Haiderer, Plaintiff's medical records revealed some issues that Dr. Haiderer was not under an obligation to ignore. Plaintiff's past records showed that Plaintiff had refused to go to appointments  (ECF No. 89, PageID.706, 708    or left the appointment early swearing (ECF No. 89,PageID.726.) Thwarting medical personnel's efforts by disrupting medical visits may also preclude recovery on an Eighth Amendment claim. *Richard v. Bokor*, 379 F. App'x 719, 720-22 (10th Cir. 2010).

 The records also showed that Plaintiff had refused to try on contact lens or simply refused the lens several times (ECF No. 89, PageID.712, 714, 720 (refused to continue to try them after 8 days); PageID.792 (Plaintiff told "offsite MP that the contacts were uncomfortable and he refused them"). A plaintiff's refusal to accept or comply with treatment precludes an Eighth Amendment claim. See, *Palmer v. Wagner*, 3 F. App'x 329, 331 (6th Cir. 2001); *Johnson v. Allen*, No. 1:15-cv-1329, 2016 WL 860428, at *4 (W.D. Mich. Mar. 7, 2016).

Further records revealed that Plaintiff refused to follow the treatment course several times yet blamed others for poor results. (ECF No. 89, PageID.716 (would not wear lens for only 1-2 hours at a time until adjusted to new lens as prescribed;

24

PageID.745 (Dr. Kolk noting that Plaintiff "refused to wear lenses along with glasses because the glasses are not tinted…he blames me for that…I didn't prescribe them though").

Previous doctors noted Plaintiff's lack of compliance and his past record of damaging items. (ECF No. 89, PageID.720 (Dr. Berhane); PageID.724 (Dr. Gerlach would not order PROSE or contacts again due to "past abuse of them"); PageID.733 (Dr. Lavery); PageID.745 (Dr. Kolk noting history of "damaging CLs and Solar Shields"). Other doctors also tried to impress upon Plaintiff that lenses would not cure or even assist with his photophobia symptoms but to no avail. (ECF No. 89, PageID.753 (Dr. Deloss ("photophobia may or may not be mitigated with PTOSE"); PageID.771 (Dr. Leung explained that the Zenlens OU is "the best CLs can offe4r and it will not solve the light sensitivity symptoms").

Prior doctors noted that Plaintiff's diagnosis did not explain his reported symptoms. (ECF No. 89, PageID.739 Dr. Hood on February 13, 2018: "[l]evel of vision [was] not consistent with corneal shape, likely effort related to some degree"; PageID.750 (Dr. Hood noted that Plaintiff's "[e]xamination does not explain visual acuity"); PageID.758 (Dr. Hood ("level of vision previously not consistent with corneal shape – likely effort-related"); PageID.768 (Dr. Hood vision "not consistent with corneal shape – likely effort related").

Therefore, Dr. Haiderer's 2019 and 2021 summaries of Plaintiff's past records including that Plaintiff had "multiple unsuccessful attempts" with offered treatments, was "[g]enerally unco[o]perative, "malingering" and that his "symptoms do not match" with objective findings were accurate and do not show any subjective bias or deliberate indifference on the part of Defendant Dr. Haiderer. (ECF No. 89, PageID.809, 832.) NP Laura Brown recounted a similar past history in 2021. (ECF No. 89, PageID.823.)

As to Dr. Haiderer's ultimate decision to not recommend Plaintiff be reevaluated for PROSE or Zenlens contacts (which had been most recently recommended by Kellogg Eye), Dr. Haiderer stated reasons comporting with the objective medical evidence and recommended Plaintiff try bifocals again. (ECF No. 89, PageID.829-30.)  It is not inappropriate for medical staff to take a prisoner's past treatment and compliance history into account when considering a course of treatment nor does disagreement with an outside doctor as to the course of treatment show deliberate indifference. *Reid v. Sapp*, 84 F. App'x 550, 552 (6th Cir. 2003)(no deliberate indifference where prison doctor rejected outside physician's recommendation of repeat surgery in favor of more conservative approach due to plaintiff's prior surgical history).

This conclusion is buttressed by other doctors having similarly concluded that neither contact lenses nor PROSE were appropriate solutions due to Plaintiff's

inability to tolerate them in the past (ECF No. 89, PageID.736 (Dr. Papendick on January 22, 2018: "consider cornea transplant. CL options have been exhausted"); PageID.766 (by February of 2019, Dr. Hood's recommendation had changed, noting "PROSE lens is no longer an option" and that since Plaintiff had "exhausted all options at this point for contact lenses fitting attempts (DWH Optometry and U of M) as well as PROSE Lens fitting (U of M)" the "only option left is surgery for the left eye."); PageID.781-786 (Dr. Leung noted that "CL tolerance was not good" and that although Plaintiff insisted PROSE would provide better vision, he had an evaluation in 2018 such that Plaintiff "should not pursue PROSE").

I suggest that this case presents a mere disagreement about the course of treatment and does not present a constitutionally cognizable claim under § 1983. *Westlake, supra*. Here, many options were tried and, to Plaintiff's mind, failed but the Eighth Amendment does not require that every request for medical care or repeated tries of previously failed options be provided. *Fitzke, supra*. I therefore recommend that Defendant Dr. Haiderer's motion for summary judgment be granted as to this claim.

### iii.  Retaliation claim

In *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999), the Sixth Circuit held that a retaliation claim has three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would

deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct."

In his complaint, Plaintiff alleges that Dr. Haiderer told him that he should not have filed a grievance against him or "gone behind his back" to get contact lenses, and that Dr. Haiderer denied his request for contact lenses in retaliation.  (ECF No. 1, PageID.23).  The prior R&R found that Plaintiff's allegation in the complaint stated the elements of a retaliation claim and that Dr. Haiderer had not challenged Plaintiff's retaliation claim in either his motion or his reply brief. In the current motion, Defendant Dr, Haiderer does challenge this claim.

Plaintiff filed many kites throughout the years, both before and after having been seen by Defendant Dr, Haiderer beginning November 18, 2019. (see ECF No. 89, PageID.803 (December 5, 2019), 805 (December 9, 2019), 812 (March 15, 2020). Dr. Haiderer's decisions were consistent with his observations and recounting of Plaintiff's history, would not deter a person of ordinary fitness from filing further kites or grievances, and certainly did not deter this Plaintiff from engaging in that same conduct. In addition, since the record is replete with evidence of continued medical examinations, evaluations and courses of treatment that were provided to Plaintiff, there is no evidence of any truly adverse action at all. Although Plaintiff disagrees with the courses of treatment offered, his disagreement with the treatment

does not make Defendant Haiderer's conduct adverse. I therefore suggest Plaintiff has failed to show a genuine issue of material fact and that Defendant Dr. Haiderer is entitled to summary judgment on this claim as well.

### D.   Conclusion

For these reasons, **I RECOMMEND** that Defendant Dr. Haiderer's renewed motion for summary judgment (ECF No. 89) be **GRANTED** and Defendant Dr. Haiderer be dismissed from this lawsuit.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant

29

to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 17, 2024                          s/PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge